ARTHUR C. PORTER v. MARY J. THROOP ET AL.

*Wills—Mental competency—Undue influence—Opening to jury.*

An opening to the jury may be so unfair in its statement of irrelevant facts, and so well calculated to prejudice the jury improperly, as to justify setting aside a verdict obtained by the party making it. But an appellate court will not reverse a judgment for an unfair opening except in a very plain case.

A will was contested on the ground of want of mental competency and for undue influence. The provisions of the will were simple and the bequests few. An old acquaintance of the decedent was asked as a witness for contestants the following question: "Having reference to the extent of her [decedent's] property, I ask you whether at the time of making this will in your opinion decedent had sufficient mental capacity to take into consideration the state of her property, the amount of it, and the relation of her children to her, so as to be competent to make this will?"

Also, "From what you know of decedent, from your acquaintance with her from the time you first knew her up to 1875, what could you say about her mental ability to comprehend and understand a disposition of her property, and her ability to make her will to the extent of this paper here" [The will]?

*Held,* that both questions were competent.

As bearing upon the issue of undue influence in obtaining a will, it is competent to show that a son who was the principal legatee had the whole charge of the decedent's business for several years preceding her decease, had been her confidential adviser and assistant, that he had lived with her; that the other children of the decedent were subject to suspicions in her mind; that the son for these reasons had every opportunity for undue influence; that a very large share of her income was used by him in his own interest; that decedent on some occasions spoke of her income being eaten up with interest, insurance and taxes; and that on one occasion, at least, a friend who had called to see the mother at her request, was by the son denied admission.

The following facts were also admissible on the same issue: That decedent and the son were executors of the will of her husband, who died in her life-time, by the terms of which she had the income for her life, and then the property was to be divided among the children; that the executors never filed an inventory or an account; that after fifteen years a daughter filed in the probate court a petition for the

removal of the executors; and that the mother and son, according
to his evidence, agreed between themselves that this was an attempt
at "blackmail."

If the mother so thought, the inference would be forcible that the sug-
gestion came from the son himself, who would thus be making his
sister's attempt to obtain a remedy for a wrong chargeable to himself
the occasion for poisoning his mother's mind against her.

Error to Wayne.    Submitted Oct. 26.    Decided Jan. 5.

APPEAL from probate.  Proponent brings error.  Affirmed.

*E. Y. Swift, Charles M. Swift, Ashley Pond* and *C. I.
Walker* for plaintiff in error.    Irrelevant matter must not be
stated in an opening to the jury : *Scripps v. Reilly* 38 Mich.
10 ; evidence of a condition of mind that is not of a permanent
nature, or, if temporary, is not shown to have existed at the
time of making the will, is irrelevant to the question of
the testator's competency :  1 Redf. Wills 545 ; *Jackson v.
Kniffen* 2 Johns. 31 ; *Comstock v. Hadlyme* 8 Conn. 254 ;
*Stevens v. Vancleve* 4 Wash. 265 ; *Provis v. Reed* 5 Bing.
435 ; *Robinson v. Hutchinson* 26 Vt. 38 ; *Waterman v.
Whitney* 11 N. Y. 157; *La Bau v. Vanderbilt* 3 Redf. 384 ;
*Shailer v. Bumstead* 99 Mass. 112 ; questions calling for
an opinion as to testamentary capacity are improper : *Kemp-
sey v. McGinniss* 21 Mich. 123 ; *McGinniss v. Kempsey*
27 Mich. 363.

*F. G. Russell, Wilkinson, Post & Wilkinson, Griffin &
Dickinson* and *G. V. N. Lothrop* for defendants in error.

COOLEY, J.  This case involves the validity of an instru-
ment purporting to be the last will and testament of Eliza
G. Porter, deceased, which the circuit court for the county
of Wayne, on appeal from the probate court of that county,
has refused to admit to probate.

Eliza G. Porter was the widow of George F. Porter, of
Detroit, who died in August, 1862, leaving children sur-
viving him; Arthur, the proponent, who had previously
married; George, who died several years afterwards being
still unmarried; Gove, who married in 1866 and died six

years or so afterwards, leaving a widow and child who still survive; and Mary who was married to Mr. Throop, in 1866, and is still living. George F. Porter left a last will, which bears date April 28, 1858, and was duly probated. By this will Mrs. Porter and Arthur were made executors without bond, and the whole income of the estate was given to the widow during her life-time, but subject to the support and education of the "younger children." On the decease of Mrs. Porter the property was to be equally divided between the surviving children, deducting from the share of Arthur a sum which had been previously advanced to him, and which appears to have been about $10,000, and also his indebtedness to his father on general account, and providing from the estate for the education and support of the younger children until they should respectively arrive at the age of twenty-one years before such distribution. The indebtedness of Arthur, not including the sum advanced to him, is stated by him at $20,000 or thereabouts, exclusive of interest.

The executors of this will never filed any inventory, but the estate appears to have exceeded $150,000 in value, the major part of it being in available corporate bonds and stocks. Arthur took exclusive charge of the estate, converted securities into cash and made improvements upon real estate which resulted in a steady and considerable income. This income is estimated by him to have averaged $7000 a year. It was collected and received by him, and the major part of it used for his own benefit. When this case was tried, he estimated that he was indebted to his mother in the sum of $80,000 on income account. After the marriage of Gove and Mary, the former entered into business copartnership with Mary's husband, which was continued for several years, during which time the mother assisted them to the extent of $30,000. They failed, however, in 1870, and of the sum advanced to them only about one-third was paid by their assignee. From time to time Mrs. Porter let Mary have some money; the whole amount aggregating $3000; and she gave small sums to the widow

and child of Gove, but they were insignificant. Arthur went to live in the house with his mother in 1875, and in October of that year the will now in controversy was executed. A copy of this will is given in the margin.* Its probate was contested on the grounds—*First*, of want of testamentary capacity; and *second*, for undue influence employed to procure it by the principal legatee.

It is in evidence and not disputed by anybody that Mrs. Porter had imbibed the suspicion that both Gove and Mary had been married from mercenary motives; and though after Gove's death she had his widow with her part of the time, it is evident she was not very cordial towards her. Arthur seems to have had her entire confidence, and managed the estate of her husband and also her own property

---

*I, Eliza G. Porter, of the city of Detroit, county of Wayne, and State of Michigan, being of sound and disposing mind and memory, do make, declare, and publish this to be my last will and testament, as follows:

*First.* After payment of my debts and funeral expenses, I give and bequeath the sum of one thousand dollars to Mary E. Porter, of Schenectady, in the State of New York, widow of my deceased son Gove Porter, but upon the condition hereinafter named.

*Second.* I give and bequeath the further sum of one thousand dollars to my grandson Winfred Carley Porter, son of said Mary E. Porter, but upon the condition hereinafter named.

In case Mary E. Porter shall be entitled to dower as widow of her deceased husband, Gove Porter, then and in such case the two foregoing bequests to said Mary E. Porter and her son Winfred Carley Porter, shall both cease, and shall become null and void; and the same shall revert and become part of my residuary estate.

*Third.* I give to my daughter, Mary J. Throop, the sum of five thousand dollars, from which sum of five thousand dollars shall be deducted the amount she, the said Mary J. Throop, may owe me at the time of my death, and balance paid to her.

*Fourth.* All the rest and residue and remainder of my estate, of every name and kind, and wherever situated, of which I may be seized or possessed, I give, devise, and bequeath to my son Arthur C. Porter, of Detroit, Michigan.

I do hereby nominate my said son Arthur C. Porter sole executor of this my last will and testament, and I will and direct that he shall not be required to give bonds as such executor, except in the sum of one thousand dollars.

In witness whereof I have hereunto set my hand and seal the twenty-ninth day of October, A. D. 1875.

                                    ELIZA G. PORTER,     [Seal.]

The said testator, Eliza G. Porter, subscribed the foregoing instrument in our presence, and at the same time declared it to be her last will and testament, and we, at said testatrix's request, and in her presence, and in presence of each other, subscribed our names hereto as witnesses.

                    D. O. FARRAND, Detroit, Mich.
                    E. Y. SWIFT,           "        "

at discretion. The fact that Mrs. Porter had made a will was not made known to Mary or to Mrs. Gove Porter, but the free use Arthur was allowed to make of his mother's means created ill-feeling. On the first of June, 1877, Mary, who was then at Orchard Lake, addressed a letter to her mother, stating that her husband was out of employment with nothing to live upon; that the hard times had swamped them; and expressing the opinion that she had "as good a right to be supported until things looked brighter as [her] amiable able-bodied brother that went home to his mother to be supported; and has lived on her for two years." She stated that she had written to Arthur twice and received no reply, and she claimed to be entitled to help from her father's estate and thought it was her mother's duty to see that it was given. To this letter a reply was written by Arthur, which is given below.* On receiving the

---

*DETROIT, June 4, 1877.

DEAR MARY: Mother has desired me to answer your letter to her of the 1st inst.

It is true that *I* have received two letters from you, demanding money, on the ground that you were entitled to support during the life-time of your mother, the first one addressed to me as executor, which was followed by one from a lawyer, requesting me to make a statement of the affairs of the estate, and apprising me that your claim would be insisted upon. I did not answer either of your letters for the best of reasons: your claim is wholly wrong and indefensible, and, having employed a lawyer, it is better that the affair should be settled through the courts.

Moreover, the charge made against me that I would not tell you anything about the estate is not true, and you know it.

I have never done a single act relating to the estate that you have not been fully informed about. I have told you where all the property was; that it was unencumbered, and *could not be* encumbered by me, and that your interest in it was intact.

What I would not tell you, however, was the income from it, and what was done with it, which I did not and do not consider as your business. It belongs exclusively to mother, and it was by her express commands that I refused you any information on the subject. I have informed your lawyer, through mine, that I have no statement to make except under the order of the probate court, and if you are entitled to support it must also be got from that source; as executor, I have no right or power to make you an allowance.

As executrix, mother is in the same position as myself; as the owner of the income of the estate, she considers it an attempt to extort money from her under a frivolous pretence, and she resents it as such.

That claim must be fully and finally abandoned before she can let you have any more money. Mother's health is better than it was a month ago; the change in the weather has been beneficial to her, and she seems to be smarter than she has been since last fall.

Mate came the 24th of May, and is now in Chicago for a short

reply Mary presented a petition to the probate court setting forth that the executors on her father's estate had received and disbursed large sums of money belonging thereto, and sold real estate; that Arthur had acted as managing director, and done principally all that had been done; that he had never made any report, and as petitioner fully believed had wrongfully and unlawfully appropriated a large portion of the estate; and she prayed that the management of the estate be taken from the hands of said executors and committed to administrators with the will annexed.

The presentation of this petition seems to have been treated by Arthur as an attempt at "blackmail," and he says of himself and his mother, "We agreed upon that point." If that was its purpose, it did not succeed. Neither did it result in eliciting from the executors any report of their doings as such. Mutual friends seem to have induced the dropping of the proceeding. Mary visited her mother frequently afterwards, but at one time in the year 1878, when she was staying at her mother's for some considerable time, Arthur went to Mr. Joy, who was a mutual friend, and informed him that his mother wanted Mary to go away; that she was determined to stay, and he requested Mr. Joy to go up there and see if he could not induce Mary to leave the house. Mr. Joy went as requested, and induced Mary to go. Whether she had been previously requested to leave does not appear. Mrs. Porter had been sick, and Dr. Farrand, who was her physician, was of the opinion that at this time she was laboring under the delusion that Mary was some other person. Mrs. Porter died in the winter of 1879–80. For ten years previous to her death she had lived a very quiet and retired life, seeing but few friends, and apparently making Arthur almost her sole confidant. Dr.

visit to some friends, when she will return and spend three or four weeks with us.

You need not depend on Dr. Farrand or *any other person* for any information in regard to mother's health. I will be pleased to answer your letters on that subject at any time promptly.

Yours truly,          ARTHUR.

I have read the above letter and approve the same.

ELIZA G. PORTER.

Farrand, who was an old family friend, was in the practice of calling upon her at least once a week, but he did not interfere in her business affairs, though she frequently spoke to him of her business in a general way.

This statement will be sufficient for an understanding of such legal questions as are deemed important.

I. In opening to the jury the case for the contestant, counsel indulged in the following language:

"In 1870 George Porter died, and before dying, gentlemen of the jury, he made a will. He made a will in the home of his mother, where he had lived during his last illness, or the latter part of his illness, with no one 'except his mother and Mr. Arthur Porter. Mr. Arthur Porter was not living there at that time, but he was frequently there. He had his mother entirely under his influence and entirely under his control, and this will of George Porter was made while he was ill and suffering from the debility arising from his disease. George and Arthur had not been friendly and were not friendly, and it is necessary that that point should be laid before you for the purpose of enabling you to understand that while George Porter made this will, yet it was made under circumstances which indicate that it was the handiwork of Arthur, and not his own expression and choice. This will was made on the 27th day of December, 1871, and George died I think in April, 1872. 'After the payment of my debts, I will, devise and bequeath all of the property of which I may die possessed, of whatever kind and description, to my mother Eliza G. Porter. I do hereby appoint Arthur C. Porter the sole executor of this my last will and testament.' This will is signed by the counsel of Mr. Arthur C. Porter, Mr. E. Y. Swift, and by the bosom friend of Arthur. C. Porter, Dr. D. O. Farrand—this same gentleman who signed the will which was executed by the mother. We shall show you with reference to this will, as bearing upon this scheme which originated in the mind of Arthur Porter shortly after the decease of his father and which he has kept up to this day, to get all the property into his own hands; that George, after these parties who witnessed the

will left the house, threw himself upon the bed crying and exclaiming it was not his will; he did not want to make it so; that he was compelled to make it so, and Arthur forced him to do it. Arthur was present in the room."

At this point counsel was interrupted by counsel for the contestant, who objected to such remarks as wholly irrelevant, but the court said if it was intended in good faith to prove what was asserted he should permit the opening to proceed, and it did proceed as follows:

" I expect, gentlemen of the jury, to be interrupted somewhat by my brothers on the other side, in the advancement of our legal rights in this case, but I am not aware of any reason why the truth should not be known from beginning to end. Truth is sometimes stranger than fiction, but at the same time when we are endeavoring to arrive at justice it ought always to be ascertained. Passing then under the apprehension of the learned counsel on the other side that some damage may result to them from pressing that question before you, and awaiting the decision of the court upon our right to offer it as legal evidence; passing I say the will of George Porter which was made in December, 1871, I come to the will of Eliza G. Porter."

Was it legal error for the court to permit counsel to indulge in this sort of talk to the jury? A solution of this question ought to be found in the probable effect upon the tribunal to which it was being addressed. We should impeach the judgment and legal knowledge of counsel if we were to assume that in making this opening he was putting before the jury those facts only, which on reflection he had satisfied himself he had a right to prove. The proposition that on an issue whether the will of one person has been made freely and with due competency, it is admissible to inquire as a collateral issue whether the will of another person has been made under undue influence, is too preposterous to be accepted by any sensible person who has ever been connected with or in the way of observing legal or any other orderly proceedings. We have a right to assume, therefore, and are bound to assume—out of respect to the judgment of

the counsel himself if for no other reason—that when he made to the jury this statement of what he proposed to show respecting the will of George Porter, he was speaking without due thought and reflection, and must have known, if he had proceeded with deliberation and due consideration, that the court could receive no such evidence as he proposed, and that his bare assertion was all he could put before the jury concerning the alleged undue influence in procuring George Porter's will. We are not disposed to assume that he expected to derive from the mere assertion of a fact an advantage which could not be had from any legitimate evidence.

Such an advantage, however, was not unlikely to follow. To offer to prove that the proponent who in this proceeding was charged with improper conduct in procuring to be made in his favor a will by his mother, had been guilty in another case of the like disreputable conduct, whereby he had forced the inclination of his diseased and feeble brother, was well calculated to impress the jury unfavorably against his case. How far their minds would be poisoned by the assertion it would be impossible to know; but the statement of respectable counsel that the damaging fact was susceptible of proof would almost inevitably, in the minds of those unaccustomed to an investigation of legal facts, attach suspicion to the conduct of the party accused, and place him at a disadvantage not justified by the law. It would compel him to take up the burden of defending his actions and motives, before they had been in any legal manner attacked or impugned, and while all legal presumptions were in their favor.

But the opening went beyond the charge against the proponent; it was pregnant also with insinuation against Dr. Farrand and Mr. Swift. These gentlemen were the subscribing witnesses to the will on trial; and the opening had the same tendency to impair the confidence of the jury in them as witnesses that it had to fix upon the proponent the suspicion of improper conduct. "These same parties," the jury were told, "who have been guilty of procuring and witnessing a will which Mrs. Porter executed either when

*non compos* or when her inclinations were forced, we shall proceed to show, unless the court prevents us on the objection of our brethren on the other side, who will naturally fear the truth, have been guilty of exactly the same conduct in the case of the feeble and dying brother. Remember this when they come upon the stand as witnesses; for we must expect that persons who will be guilty of such transactions will support them by their evidence if possible." This is what the opening, though couched in perfectly respectful language, must be understood to suggest; and so the jury must have understood it. We are not surprised that when the offer was subsequently made to put in the evidence, and it was objected to, no attempt was made to support it. The offer and objection had put the contestants in the attitude of being apparently willing to investigate the alleged misconduct in connection with the will of George Porter, and the proponent in the attitude of apparently fearing the truth respecting it.

It seems almost inevitable that this course should have had some tendency to defeat the ends of justice. The case was one which upon its facts as subsequently developed might well be considered close and doubtful. Whichever side began the case with a prejudice in the minds of the jury against his adversary was possessed of an advantage which might in the end prove controlling. If that advantage was obtained by putting before the jury damaging facts which could not be investigated in the case, and which for that reason it was improper for counsel to assert, it was an unfair and illegal advantage, and the court should have interposed to prevent it, with promptness and efficiency.

The trial court failed to perform this duty, and the question now is whether the judgment should be reversed for that cause. Upon this question we have not been entirely free from doubt. We agree that the trial court must in its discretion supervise the opening of the case by counsel, and that in general a judgment is not to be disturbed merely because in our opinion the course which the opening was suffered to take was calculated to do injustice. In a variety

of cases the action of the trial court must be final even when we are satisfied it is wrong; for the simple reason that in such cases the final decision is left by the law to that court. But we held in *Scripps v. Reilly* 38 Mich. 10, that the opening of the case might be so unfair and unjust and so certain in its tendency to mislead the jury, that to suffer it would be legal error. If this case were altogether analogous to that, we should so hold again. The chief difference in the two cases is that in the *Scripps v. Reilly* case the opening embraced the reading of irrelevant papers; and these were much more likely to fix themselves in the minds of the jury as evidence, and to impress them with fixed opinions, than any mere oral statements. With considerable hesitation the court has reached the conclusion that this difference in the cases requires of us in this a different judgment. The circuit judge ought to have perceived his error and corrected it, but under the circumstances we are not agreed that we should interfere.

II. To show want of mental competency in the decedent, Mr. James F. Joy was called by the contestant. He had been well acquainted with the affairs of George F. Porter's estate, and, after Gove Porter's failure in business, had purchased his interest in that estate and transferred it to the mother. He had been for many years the friend of the family, visited Mrs. Porter occasionally, and had considerable knowledge of her business affairs. The instrument in controversy was exhibited to him, and he was asked the following question:

" Having reference to the extent of her property, I ask you whether at the time of making this will in your opinion Mrs. Porter had sufficient mental capacity to take into consideration the state of her property, the amount of it, and the relation of her children to her, so as to be competent to make this will?" To this the answer was, "I do not think she did."

Also, " From what you know of Mrs. Porter from your acquaintance with her from the time you first knew her up to 1875, what could you say about her ability—her mental

ability—to comprehend and understand a disposition of her property, and her ability to make her will to the extent of the paper which you have seen introduced in evidence; this paper here?" *Answer.* "I know she positively could not have done it."

Both these questions were objected to as calling for the opinion of the witness upon the decedent's testamentary capacity generally. We do not think the objection is well taken. Both questions called the attention of the witness to the particular instrument; a very plain and simple instrument; and did not invite him to consider whether she had capacity to understand any will whatsoever that might be presented for her signature, or any will containing complicated or abstruse provisions. This general subject was so fully considered in *Kempsey v. McGinniss* 21 Mich. 123, that discussion in this case would be superfluous. The decision in that case was approved when it was brought up the second time. *McGinnis v. Kempsey* 27 Mich. 363.

III. The case in the court below seems to have been contested most earnestly on the issue of undue influence. All the evidence which was put in by the contestants on that issue was objected to as incompetent; and in this court it was contended that the record showed no competent evidence whatever which had a tendency to show that Arthur exercised any undue influence over his mother for any purpose, or that he had any agency, direct or indirect, in procuring the will, except as, at his mother's request, he invited counsel to visit her and draft it. If the evidence put in had no such tendency it was of course improperly admitted upon that issue.

It is not pretended there is any direct evidence of undue influence, and from the nature of the case such evidence could not have been looked for. Arthur for some time before the will was executed had been his mother's confidential adviser and assistant, and had had exclusive management of her affairs. Those who had business with her were brought in contact only with him; he was her agent and her mouth-piece, and so far as the public or even friends had

the means of knowing, his was the guiding and controlling mind as well as the executing hand. The other children were not in her confidence. Having fastened an unworthy suspicion upon the wife of the one and the husband of the other, she seems to have come to regard them almost as strangers. The friendly intercourse between Mrs. Porter and her old acquaintances seems to have been of the most commonplace character, and she made none of them a confidant in respect to the details of her business affairs.

There is no doubt whatever that the circumstances gave Arthur the opportunity for undue influence if he was disposed to make use of it. But the fact of the opportunity goes for nothing unless it is shown that it was actually embraced. Contestants undertook to put in evidence which though not directly proving it, rendered it highly probable. The facts which they sought to prove, and which they now claim they did prove, are the following:

1. That Arthur deceived his mother in respect to her property and the income from it, and made her believe she was in straitened circumstances.

2. That he kept her friends from seeing her, sometimes when she had requested their visits, and under circumstances indicating improper motives.

3. That he caused Mary to be removed from the house at one time under circumstances indicating that the mother was excited without known cause against her.

4. That the mother harbored unjust thoughts of Mary which were traceable to the sugestions of Arthur himself.

5. That while all these things, so far as there was tangible proof of them, occurred after the time the will was made, yet this was while the situation as it then was remained apparently unchanged, and the inference was therefore reasonable that the improper control he had apparently established over the mind of his mother had existed before the time of the making of the will.

These are the claims the contestants make. As to the deception of the decedent in respect to her property, the evidence, such as there is, is all of a negative character. It

is shown that for several years before her death 'she lived in a very economical way and as though she believed herself to be poor; that a part of the time she kept no servant; that when Mrs. Gove Porter was with her, she expected her to do household work, and told other persons she was paying for such work. All this standing by itself indicates a miserly disposition quite as much as it ·does a belief in her own poverty, and is too ambiguous in its suggestions to constitute any safe basis for an inference of deception. It is also testified that on some occasions Mrs. Porter assigned as a reason for her parsimony that Arthur said the taxes and insurance were eating up the estate. This again may have been a miserly disposition assigning a false reason; it is no proof that Arthur ever said so, as the court in his instructions to the jury seemed to assume. It is further testified that on some occasions when making small presents to other members of the family she desired the fact concealed from Arthur as though she feared complaint. This fact, if established, would not be without considerable significance, for the inference it suggests would be unfavorable to the freedom of action which a will requires.

But we think that under the circumstances it was proper to receive and submit to the jury all this evidence. Separately the different items of it proved nothing, but together and with other admitted facts the jury might be justified in attaching to them some considerable importance. It was unquestionable that Arthur was managing his mother's property at discretion; that he was receiving as her manager a large income; that he was appropriating the major part of this income to his own use; and no other member of the family knew or had the means of knowing in her life-time whether she was kept advised of the condition of her estate, of the income arising from it, or of the use which was being made of it. There was a secrecy about the whole business which invited unpleasant reflections; and we cannot say that there was not in some of the decedent's statements to others, a tendency to show that she was under Arthur's control.

That persons were sometimes denied admittance to the

house by Arthur when they called to see his mother is proved beyond dispute. The conspicuous case was that of Dr. Eddy. Mrs. Porter had expressed a desire that this prominent clergyman should visit her, and a lady to whom it was expressed, communicated the wish. Dr. Eddy accordingly called, but was met by Arthur at the door and denied admission, though he explained that he called on request. This occurrence was perhaps a year after the will was executed. No reason is assigned for the refusal to admit Dr. Eddy, and on the part of the proponent it is spoken of merely as an ungracious act, but without significance. It is shown that Mary was in the house at the time, and that Arthur at once reported the call; and it is urged that this shows he could have had no reason for excluding Dr. Eddy from the house which concerned the disposition of the property. But we cannot know this. It is well established that at this time Mary had no influence with her mother, and Arthur, whatever his purposes, need not fear to have the two together. But if others were to see the mother whom he might suspect of a disposition to interfere in the family affairs, the presence of Mary he might look upon as a dangerous incentive to such interference, and therefore the time of her presence might be the time of all others when he would be disposed to keep others away. We can only say of this evidence that it did not absolutely require an unfavorable inference, though it might invite it.

The facts about Mary being sent away from the house on one occasion appear to be these : The mother was quite unwell with fever, and Dr. Farrand testifies that the presence of her daughter excited her. He thought she was laboring at the time under the illusion that Mary was some other person. Arthur went to Mr. Joy and told him his mother wanted Mary to leave the house, and desired that as a friend of the family he should go and induce her to leave. Mr. Joy complied, and on his advice Mary went away. Mr. Joy did not ascertain whether the mother really wished her to go, nor, though he conversed with the mother, does he seem to have discovered any delusion. If the facts

were as Dr. Farrand understood them, they have no signifi-
cance in this case ; if they were as Mr. Joy supposed, they
only show estrangement between mother and daughter; a
fact fully shown by other evidence, and disputed by no one.
The conduct of Arthur in the affair was improper only on
the supposition that his report to Mr. Joy of his mother's
wishes was unfounded.

The only fact of much importance in its tendency to
show that the contestant may have poisoned the mind of his
mother against Mary is found in what he himself says of
the attempt which his sister made to procure a change in
the administration of her father's estate. To understand
this transaction it is necessary to keep in mind the ante-
cedent circumstances.    Mary was an equal beneficiary
with her brother under her father's will. It is true that
she had no legal right to share in the current income, but
she had a right to know what the property was, how it was
invested, whether it was being kept intact until the right to
enter into the enjoyment should ripen and all about it. For
fifteen years the administration had nominally been 'in pro-
gress, but with no inventory, no report, no accounting.
Every year's delay was a wrong which Arthur perpetrated
upon his sister, and no one could justly blame her for com-
plaining of it.    Her legal rights were steadily and per-
sistently withheld ; and the wrong was rendered particularly
aggravating by the fact, which must have been patent and
notorious, that her brother, while keeping from her the
information concerning her own interests, was so managing
affairs as to be the chief and almost the only beneficiary of
the mother's bounty so far as she saw fit to distribute it in
her lifetime.

It was under these circumstances that the petition for a
change in administration was presented to the probate court.
As the petition contemplated the removal of her mother
and brother, it should have been offered only as a last resort,
and when other means of redress seemed unavailable. But
there was an undoubted right to present it, and Arthur as
a business man must have known this. He must also have

known that it was aimed at a real and very substantial wrong. Nevertheless he informs us that he and his mother "agreed" that this attempt by his sister to secure a change in administration was an attempt at "blackmail;" they seemed to have talked it over by themselves and agreed that it should be characterized by this offensive term. Now it is incredible that the mother, if she had been in the full possession of her faculties and acquainted with all the facts, could ever have assented to any such view. She must have known that whatever wrong there was in the transaction was not chiefly attributable to her daughter. If Arthur "agreed" with her that the daughter was attempting "blackmail" when she thus undertakes to right her wrongs suffered at his hands, he has no reason to complain of injustice if the inference is drawn that what the mother agreed in he first suggested. It would be a very natural inference under all the circumstances. And if Arthur made use of this petition to poison the mind of his mother against his sister, the fact was one it was proper to allow her to put before the jury.

Nearly all the objections made to the instructions to the jury depend for their validity upon questions which lie back of them, and which concern the competency or sufficiency of evidence. They therefore require no separate comment. We do not find any clear error in the instructions. If any of them were liable to just exception, it was what was said in regard to Mrs. Porter's income and the taxes and other expenses. The proponent had requested a charge that "there is no evidence tending to show that Arthur falsely led his mother to believe that the income of the estate left by her husband was nearly all used up by taxes, insurance and other expenses." This was refused, and instead the judge told the jury "that while it may be true that there is no evidence that the income was eaten up by taxes, etc., it is I think in evidence that she believed it so; so if it appear that Mrs. Porter committed the whole of her business to Arthur, and acted through him, and got from him all the knowledge she had about the estate, and that impression is one that Arthur could have at once

corrected, you may consider whether she got the impression from Arthur." Now as there was evidence that the mother stated that Arthur said the income was eaten up with taxes, etc., we do not think this instruction was calculated to do any injustice. Her statement did not prove the fact, but it was properly submitted to the jury, and it was for them to draw inferences.

The order will stand affirmed with costs.

GRAVES, C. J. and CAMPBELL J. concurred.

MARSTON, J. I concur in the above, except as to the conclusion arrived at upon the first question discussed. In my opinion there was error in the remarks of counsel in the opening statement of the case.