PAGE *v.* BEACH.

134   51
136  193
134   51
j144 ³617
134   51
146 ¹468

1. WILLS—EVIDENCE—OPINIONS—MENTAL CAPACITY.

The opinion of a witness as to whether a person had sufficient mental capacity to make a will is inadmissible, where such opinion involves a determination of the legal question of what constitutes mental capacity.

2. SAME.

A question calling for the opinion of a witness as to the mental capacity of a testator to make a will is not improper by reason of its failure to limit the opinion to the particular will in controversy.

3. SAME.

On the trial of the probate of a will, a witness testified that, as commissioner on claims of an estate, he went to the residence of the testatrix to take her testimony, and that, when he asked her how old she was, she cried, and wanted to know why they came there; that she was sittting up, in apparent good health, but fleshy and old, and most of the time half crying. The witness was there half an hour, and never saw her before or afterwards. *Held*, error to admit the opinion of the witness that she was incompetent to make a will.

4. SAME—UNDUE INFLUENCE.

Where a will is contested on the ground of undue influence, it is proper to investigate fully all the relations between the testatrix and her children.

Error to Calhoun; Smith, J. Submitted May 14, 1903. (Docket No. 74.) Decided July 8, 1903.

Petition by Mary E. Page for the probate of the will of Lurena Beach, deceased. The will was disallowed in both the probate and circuit courts, on a contest made by Lyman F. Beach and others, and proponent brings error. Reversed.

*R. J. Kelley* (*Herbert E. Winsor*, of counsel), for appellant.

*F. W. Clapp*, for appellees.

Hooker, C. J. The testatrix was about 90 years of age when she made the will in question, and the mother of several adult children. Mrs. Page, a daughter, petitioned for the probate of the will, and the same was contested by several, if not all, of her brothers and sisters. Probate was denied in the probate court, and in the circuit court upon appeal, and the case is before us on writ of error taken by the proponent. The questions submitted to the jury were incompetency of, and undue influence upon, the testatrix.

The testimony shows that Mrs. Beach and her husband resided upon the premises which seem to constitute the chief object of contention, viz., a house and lot. They both made wills some years before this will was made, and they were kept in the house, which was thought by some of the sons and daughters to be imprudent. Upon one occasion, when their son Lyman Beach, of Bay City, and their daughter Mary Page, and perhaps other children, were present, it was agreed that Lyman should take these and other papers of his parents, and deposit them in the Review & Herald Company's vault, in Battle Creek, which he did. Subsequently Mary Page became dissatisfied about this, and complained to her parents that Lyman had gotten all of the property in his control, and would swindle them out of it; and so much was said that on Lyman's next visit he procured the papers, and returned them.

After the death of Mr. Beach, which occurred a year or two before the will in question was made, there was considerable controversy between the children; Mary Page being especially outspoken. She lived with and cared for the testatrix, and was unwilling to have her sisters in the house. She made very harsh charges against her brothers and sisters to the mother, and conducted herself in a way which gives some color to the charge that she was endeavoring to influence her mother in her favor as to the disposition of the property. At some stage of the proceedings a guardian was appointed for the mother by

the probate court, and, while the property remained in the custody of Lyman, as executor of his father's estate, the allowance of $16 a month made by the guardian was paid. The quarrel as to who should be allowed to live with the testatrix became so violent that the guardian attempted to have some other person take charge of her, to the exclusion of both Mrs. Page and her sisters; but Mrs. Page seems to have succeeded in retaining her hold, and, about a month before the testatrix's death, arranged with a lawyer to go and see her mother, and draw a will for her, which was done. This will provided that Mary Page should receive the house and lot, and that the remainder of the property should be equally divided.

Several nonprofessional witnesses were permitted to give their opinions against the competency of the testatrix to make a will, and it is contended that this was error, for two reasons, viz.: (1) They had not stated circumstances inconsistent with competency, before being asked for opinions; and (2) the questions should have referred to the particular will in question, and not to any and all wills.

The object of these inquiries was to enable the jury to judge of the competency of the testatrix. While necessity has led the courts to admit the opinions of nonexpert witnesses as evidence upon the question of competency, they do not recognize the propriety of taking the witnesses' opinions upon a question of law. The inquiry is directed toward the condition of mind; and if a witness is asked whether, in his opinion, the person had capacity to make a given contract or will, or a contract or will, the witness must first determine in his own mind the degree of intelligence or capacity that the law requires, and, next, whether the person was possessed of the requisite understanding, memory, self-control, etc. This was pointed out in the early cases of *White* v. *Bailey*, 10 Mich. 159; *Beaubien* v. *Cicotte*, 12 Mich. 501; *Kempsey* v. *McGinniss*, 21 Mich. 144. In *White* v. *Bailey* a witness was asked, ''From what you saw, what was his [testator's]

mental capacity?" The witness was a physician well acquainted with the testator. It was held that an answer was properly excluded, for the reason that the question asked for the doctor's opinion of the mental capacity of the testator to make a will, "for that was the issue," which Mr. Justice MANNING said was "a question of law, and not of medical science." He added:

"It is for the jury, under the instruction of the court as to what is sufficient mental capacity to make a will, to decide on its existence or nonexistence when the will was executed, from the facts testified to by the witness, and not from the witness' opinion regarding such facts. The jury, and not the witness, are to draw the conclusion from the facts stated by the witness. The opinion of a physician as to the existence of disease or a particular malady, and its effect upon the mind, would be evidence. But a physician's opinion regarding mental capacity generally, or the mental capacity necessary to make a will, is, in the eye of the law, no better than that of any other person."

The case of *Beaubien* v. *Cicotte*, 12 Mich. 459, contains an exhaustive discussion of the propriety of taking the opinions of witnesses regarding the mental condition of a testator, written by the late Mr. Justice CAMPBELL, and fully vindicates the rule that "all who have had means of observation may testify concerning the existence and measure of capacity." But, as foreshadowed by his opinion in the case of *White* v. *Bailey*, in which Mr. Justice CHRISTIANCY concurred, he held that the witnesses might be asked for their opinions of the testator's capacity *with reference to the matter in controversy*, from which it may have been inferred that, in his view, it was proper to ask if, in the opinion of the witness, the testator was mentally competent to make a given will or contract. But it is doubtful if that was intended, for no such question was involved in that case; and, in a case decided a short time afterward, the subject of questions involving legal conclusions was elaborately discussed by Mr. Justice CHRISTIANCY, and the *Beaubien Case* was referred to. *Kempsey* v. *McGinniss*, 21 Mich. 143. He there said:

"I am aware there are many cases in which, upon similar questions, interrogatories have been allowed to be put to witnesses for their opinion, involving as well their opinion upon the question of law (legal capacity) as upon the question of fact (what the capacity was). In most of them, however, the point I am discussing was not directly raised. And, upon principle, I can see no ground upon which such a course can be justified when the nature of the case does not render it necessary, and it can, as in the present case, be just as well avoided. I think the principle stated by my Brother MANNING in *White* v. *Bailey*, 10 Mich. 159, is entirely correct, though I did not think the question to the witness in that case called upon him to give an opinion upon testamentary capacity, and for this and other reasons apparent in the case I did not concur in my Brother MANNING's opinion, but in that of my Brother CAMPBELL.

"It would have been much fairer, more in accordance with principle, and much less in the nature of leading questions, to have put the questions in such a manner as to call only for an opinion of what the real state of the testator's mind was, how much intelligence he possessed, how far he was capable of understanding the nature and situation of his property, his relations to others, and the reasons for giving or withholding his bounty as to any of them, etc., than to ask them whether he had a disposing mind and memory, or whether he was capable of making a will. The course I have suggested as the true one was adopted by the propounders in their examination of professional witnesses, and by the contestants, also, in some of their questions which were not objected to by the proponents of the will. The form of the questions put to the witnesses for their opinion in *Beaubien* v. *Cicotte*, 12 Mich. 459, and approved by this court, is correct in principle, and avoids the objection now under consideration, though some of the cases there cited I do not think sound in principle upon this point. These questions were whether, from the conversation then had with him, and from what he then saw of him, he was capable of understanding a document of any considerable length, if it had been read to him; also what capacity the testator had, and whether, in the opinion of the witness, the testator was at the time capable of holding a conversation like the one testified to by another witness. It is obvious that, so far as the point we are now discussing is involved, there is no distinction

to be made between questions put to witnesses giving their opinions from personal observation, and those who give theirs upon a hypothetical state of facts."

The following questions were asked, viz. : "What is your opinion as to the testator's being of sound and disposing mind and memory, so as to be able to transact business, from 9 until 11 o'clock of the day in question ? " And, " In your opinion, was the testator in a physical and mental condition to make a will ? " These questions—especially the last, but both—were said to be objectionable, as " calling upon the witness for his opinion upon the legal standard of a *disposing mind and memory*, or the *legal capacity to make a will*."

We have seen that Mr. Justice CAMPBELL was not inclined to stickle over the form of the question. See *White* v. *Bailey*, 10 Mich. 161, where he said, "The mere form of the question is not, to my mind, very conclusive." Mr. Justice CHRISTIANCY was clearly of the opinion that the two questions stated were improper, but he also thought the error unimportant, if their exclusion by the trial court was error, for the reason that other questions calling for the same testimony were put and answered. He said:

" But, even if these questions might have been admissible without error, still I do not think the judgment should be reversed for their exclusion, since questions assuming all the same facts, and calling for the opinions of the same witnesses upon all the same matters of fact, were allowed and put to both witnesses, when asked, assuming these facts, what, in their opinion, was the effect of that disease upon the physical and mental faculties of the testator, in answer to which they detailed their opinions in full." *Kempsey* v. *McGinniss*, 21 Mich. 145.

The learned jurist then discussed some questions which he thought *were* proper, under the rule laid down in *Beaubien* v. *Cicotte*, showing that his views were not at variance with that case. He said :

" Two questions, however, were put by the contestants to Dr. Pratt, upon the assumption of the same facts, and

overruled by the court, which I think did not properly fall within the objection I have been discussing: *First,* 'Was the testator, in your opinion, at the time,' etc., 'capable of planning and executing such a paper as is here offered as his will?' and, *second,* 'Was he in a mental and physical condition to transact any business requiring an exercise of the judgment, the reasoning faculties, and a consecutive continuation of thought?'

"The first of these questions was, I think, admissible, under the decision of this court in *Beaubien* v. *Cicotte,* 12 Mich. 505; and I concur entirely with my Brother CAMPBELL in that case, that it is proper to put such questions to the witness as call for his opinion upon the capacity of the party to understand the very act or kind of act in dispute. I am unable to see the soundness of the principle in which five of the judges concurred in the *Parish Will Case* [25 N. Y. 9], that the question in every case is, 'Had the testator, as *compos mentis,* capacity to make *a* will?' not, 'Had he the capacity to make the will produced?' Men do not make wills in the abstract, but some particular will; and the question should, I think, always relate to the capacity to understand and make the will in controversy. Some wills are short, plain, and easy to be understood; others are long and exceedingly complicated in their provisions. If the testator sufficiently understands the short and simple will which he *has made,* it should not be set aside because he had not the capacity to understand the long and complicated one which he *did not make.*

"But both the questions above mentioned put to Dr. Pratt, when fairly construed, call, I think, only for the witness' opinion as to the degree of intelligence actually possessed by the testator, without any opinion of his on the legal question of testamentary capacity; and this either party had a right to show, whether it should be greater or less than the law requires to constitute testamentary capacity in reference to the will in question. The rejection of these questions was therefore, in my opinion, erroneous."

This opinion was concurred in by the full bench, including Mr. Justice CAMPBELL, and it seems to us to dispose of the claim that *Beaubien* v. *Cicotte* and *White* v. *Bailey* justify the inference that a question clearly calling for an opinion involving a determination of what constitutes legal capacity is proper.

From a comparison of the questions ruled upon, it seems easy to see the distinction. A witness may say the testator had not sufficient intelligence to comprehend a given instrument; that he had not memory sufficient to remember the natural objects of his bounty, or his desires regarding the disposition of his property; and that he was without the mental power or will to carry out his intentions. In saying this, he deals with questions of fact, and has no occasion to determine a legal question. But when asked if a person is competent to make a will, or a particular will, that cannot be said. Perhaps some of these questions might be understood by the jurors as calling merely for the degree of intelligence, as bearing upon the understanding, recollection, and will power. In such case no harm would be likely to follow. But the case of *Kempsey* v. *McGinniss* has set at rest, what never ought to have been in doubt, viz., that, where the question of law is involved in the interrogatory, it is improper. Doubtless the practice of asking the objectionable question has prevailed. Mr. Justice CHRISTIANCY said that it had, and that usually this point had not been raised. Many of us know that the practice is common, and, unless questioned, it is not fatal to a judgment.

In *Porter* v. *Throop*, 47 Mich. 324 (11 N. W. 174), an objection was made to questions stated, upon the ground that they called for the opinion of the witness upon the decedent's testamentary capacity generally. It is apparent from the questions that the ability of the testator to *understand* the will was inquired for; but the important fact is that Mr. Justice COOLEY unqualifiedly indorsed the opinion in *Kempsey* v. *McGinniss*, 21 Mich. 123, and interpreted the later decision of the same case as fully approving it.

In *Rice* v. *Rice*, 50 Mich. 453 (15 N. W. 545), it is said that the early cases had been misunderstood, and it again cites with approval *Kempsey* v. *McGinniss*, 21 Mich. 123; and it was said that it was "very evident that some of the witnesses had no just conception of what was meant

by 'insanity' or by 'testamentary capacity,' *. * * and expressed opinions * * * formed by standards altogether incorrect and misleading."

*Kempsey* v. *McGinniss* is again approved in *Spratt* v. *Spratt,* 76 Mich. 393, 397 (43 N. W. 627), and in *Prentis* v. *Bates,* 93 Mich. 245 (53 N. W. 153, 17 L. R. A. 494). In the latter case the questions put did not include the legal question; *e. g.:* " Witness was then shown the will, and asked his opinion upon her mental capacity to make it, and he replied that he thought it 'would be a very difficult matter for her mind to master it.'" And, " This witness then testified that he thought her mentally incapable of comprehending the will." And, "Witness then gave his opinion that Mrs. King did not possess sufficient mental capacity to understand the will, and sufficient active memory to retain it in her mind without prompting." And, "Because she could not comprehend; that is, I considered that she could not comprehend it. I am speaking more particularly in connection with this work that I had in hand there." And, "Witness was then asked his opinion of her mental capacity to understand this will, to which he replied: 'I doubt it. I doubt whether she would understand the last part of it.'" See *Prentis* v. *Bates,* 88 Mich. 577–580 (50 N. W. 637); *Id.,* 93 Mich. 240 (53 N. W. 153, 17 L. R. A. 494). See, also, *O'Connor* v. *Madison,* 98 Mich. 189 (57 N. W. 105); *In re Hogmire's Appeal,* 108 Mich. 413 (66 N. W. 327); *Rivard* v. *Rivard,* 109 Mich. 115 (66 N. W. 681, 63 Am. St. Rep. 566); *People* v. *Casey,* 124 Mich. 283 (82 N. W. 883).

We have discussed this question at length for two reasons: *First.* Because there must be a new trial, and it seems to us that there is a growing tendency to leave the question of legal capacity to witnesses, rather than to juries, which aids materially the practice of setting aside wills for insufficient reasons (attention to which has been repeatedly directed in former cases), which it facilitates, and which an adherence to the correct rule might retard.

*Second.* In connection with proponent's claim that the opinions should have been confined to the capacity of the testatrix to made the will in question.

The question which the jury were to pass upon in this case was whether the testatrix had capacity to make this will. Anything tending to show that she had not was proper evidence to go before them. It might be that facts and circumstances within the knowledge of the witness would justify the conclusion that there was a degree of insanity or mental incompetency which made her incapable of comprehending any will or of doing any kind of business, or that she was an idiot, without any apparent intelligence; and in such a case we cannot say that a witness should not be permitted to express an opinion to that effect, or that he might not say that she had not sufficient intelligence to comprehend the particular will or any will. We understand that no case in this State has held to the contrary, and think the questions put were not improper by reason of the failure to limit them to the will in question. It might be different if the witness were expected to determine the legal question, for then he would have to apply his facts and opinions to that, whereas he might otherwise express his opinion as to the impairment of her faculties in regard and as related to many things, leaving to the jury the duty of determining whether she had capacity to make the particular will. The confusion on this subject, if there is any, may be traced to the improper practice hereinbefore discussed.

Opinions of incompetency were expressed by several witnesses, and it is claimed that in some instances there was an absence of that foundation for the inquiry which the law requires. Judge Hopkins testified that in 1899 he, as commissioner on claims in her husband's estate, . went to her house to see whether she would be a competent witness to be sworn. When asked her age, she began to cry, and witness said that he thought she said, " I don't know; ask Mary." She asked what the people were there for. When asked about her physical appearance, he said :

"Why, she was sitting in a chair. She was a large woman, and seemed to be fleshy. She seemed to be in a good state of health, as far as I could judge, for a woman of her age.

"*The Court:* Just describe her, but do not say what she seemed to be.

"*A.* She was an old lady. During all the, time I was there she remained seated in a chair. She was more than an ordinarily fleshy woman. She had the appearance of being a very old woman. She was, most of the time that I was there, kind of half crying.

"*Q.* From what you saw of her there, and her talk, did you form an opinion as to her mental capacity?

"*A.* I did.

"*Mr. Kelley:* I object to his stating his opinion, as incompetent and irrelevant.

"*The Court:* He may answer.

"*Mr. Kelley:* An exception.

"*A.* My opinion was that she was wholly incompetent."

Cross-examination:

"*Mr. Kelley:* Now, may it please your honor, for the purpose of making the record in this case, I ask your honor to strike out all of the testimony of this witness as to the conversation and the appearance of the testatrix, and also as to his opinion as to her competency to make a will.

"*The Court:* I will deny the motion. (An exception taken for proponent.)

"*Q.* Mr. Hopkins, had you ever seen Lurena Beach before?

"*A.* I never had.

"*Q.* Did you ever see her afterwards?

"*A.* I never did.

"*Q.* So this occasion, which must have been within 30 days prior to the 14th day of July, 1899, was the only time that you ever saw her?

"*A.* It was.

"(Witness continuing.) We were there about half an hour. It might have been longer. There were Mr. Clapp, Mains, Green, Whipple, and myself. There were no other persons in the room. The five of us went into the room, closed the door, and Mr. Clapp asked the old lady how old she was, and she said, 'I don't know; ask Mary.' I cannot tell what was the next conversation. I

know I talked with her and asked her some questions, but I do not know what was the conversation.

"*Q.* When you five men went into the room and closed the door, did that old woman turn her face around in her chair and say, 'What are you here to trouble me for?' or question to that effect?

"*A.* Well, I think she said that before we went in there. Before the other people went out of the room I think she said something like that.

"*Q.* What other people?

"*A.* Mrs. Macomber, Mrs. Bloomfield, Mr. Beach, and Mrs. Page.

"*Q.* Three of the contestants in this case were present, and Mrs. Page?

"*A.* I would not say they were all in the room, but my recollection is that she said that before we went in there by ourselves and closed the door.

"*Q.* Didn't she say, 'Why do you men come here to bother me?' Didn't she make use of that expression?

"*A.* She might have; I don't remember.

"*Q.* Don't you remember that you, or some member of the party, after the door was closed, asked who had taken care of her and nursed her?

"*A.* She might have been asked. I do not remember. I don't remember of such a remark.

"*Q.* Didn't you go there as a commissioner to see about the merits of a claim against Artemus Beach's estate?

"*A.* We went there to see if Mrs. Beach was in a competent state of mind to make an intelligent answer.

"(Witness continuing.) I know she was a mental wreck.
\*   \*   \*

"*Q.* Have you stated to this court and jury every act and word, as near as you can remember, that you heard from Lurena Beach on the occasion in question?

"*A.* Well, as near as I can remember. I don't remember now any other definite question, although there was quite a little more said.

"*Q.* Did she say a good deal?

"*A.* No."

This testimony is easily reduced to the following: Soon after the death of her husband, the commissioner on claims in his estate went to take her testimony on a pending claim of her daughter Mary Page, and, when asked how old she was, she cried, and wanted to know why they

came up there.   She was sitting up, and in apparent good health, but fleshy and old, and, most of the time that witness was there, was half crying.   The witness was there half an hour, and never saw her before or afterwards.   It does not appear whether her testimony was taken or not. It was error to take the opinion of the witness, under the circumstances, though it was proper to prove the circumstances, leaving the jurors to draw their own inferences. The opinion of Howard Green had but little better foundation.   If Mrs. Beach was in the semi-idiotic condition that counsel claims, there ought to be many facts and circumstances within the reach of contestants to show it.   The practice of proving by a witness two or three instances of tears, forgetfulness, anger, or some other emotion or idiosyncrasy, of doubtful significance, as a ground, and then taking the opinion of the witness (frequently biased) that the person is insane or incompetent or without sufficient understanding or intelligence to do the act in question, is contrary to the rule, as we have often said.

We discover no error in the rulings in relation to the testimony upon the subject of undue influence, except the exclusion of proof of the relations between Mrs. Page and her mother.   It was proper to investigate fully the relations of the testatrix and all of the children.

There were many requests to charge, and many assignments of error relating to them.   The charge was a fair and impartial one, and seems to fairly cover the questions raised, and we think it unprofitable to discuss it, inasmuch as the case must be reversed on other grounds.

The order is reversed, and a new trial directed.

MOORE, CARPENTER, and GRANT, JJ., concurred. MONTGOMERY, J., did not sit.