BROWSE T. PRENTIS AND RACHEL L. DOTY v. GEORGE W. BATES ET AL.

*Will—Mental incompetency—Conduct of counsel—Opening to jury—Insanity—Evidence—Hypothetical questions—Expert testimony.*

1. The burden of proof is upon the contestants of a will to establish undue influence and incompetency to make it, and it is incumbent upon them to produce positive proof in support of either one or both of these propositions to entitle them to a verdict.

2. Counsel, in their opening to the jury, should be limited to a brief and concise statement of the facts which they propose to prove, of which it is their duty to inform themselves, and to satisfy themselves of their *right* to prove them; and such opening is not the place for argument.[1]

---

[1] See *Zucker v. Karpeles*, 88 Mich. 413, and cases cited in footnote.

| 88 | 567 |
|----|-----|
| 93 | 243 |
| 88 | 567 |
| 95 | 409 |
| 88 | 567 |
| 98 | 189 |
| 88 | 567 |
| s50NW | 637 |
| 133 14 | 41 |
| 88 | 567 |
| 134 7 | 59 |
| 88 | 567 |
| 136 | 5196 |
| 88 | 567 |
| f139 2 | 667 |

3. Especially is it the duty of courts to exclude from the jury the unjustifiable statements of counsel, as well as immaterial and incompetent evidence, which might prejudice them, in a case involving the validity of a will, when the soundness of the testator's mind was not questioned during his life-time by any of his relatives, and he was left in the entire control and management of his large property until his death.

4. A will was contested on the grounds of undue influence and mental incompetency. After the case had been argued to the jury for six days, the court withdrew the former question from their consideration. On appeal by the proponents, they objected to the action of the court; on the ground that the ruling should have been made at the close of contestants' testimony, it being fair to presume that the jury were prejudiced by the arguments of contestants' counsel upon the question of undue influence. And it is held that it is important to eliminate such questions from the consideration of the jury as soon as possible, and that it is the better practice to have them discussed in the absence of the jury, if claimed to be questions of law and not of fact; but that it is quite possible, even where the question is first argued before the court alone, that the judge may not become convinced of his duty in the matter until after the arguments to the jury, and in such a case it will not be presumed that they did not follow the instructions of the court, and leave the question out of their consideration.

5. Testimony that a testatrix talked more than some others; that she seemed erratic; that she talked upon various subjects; that she changed her mind as to the cost of a house which she was building; that she wanted different arrangements made from what the architect thought proper or consistent with good building; that she once got angry and screamed; that she scolded the men who were at work, changed her mind about colors, and became enraged and angry at those who were building her house,—is incompetent, and does not tend to show her insanity or testamentary incapacity.

6. Testimony that a sister of a testatrix became insane, and that her niece, at the age of 34, was sent to an asylum for treatment, is incompetent as tending to show her incompetency to make her will; no insanity being shown in any of her ancestors, and that of her sister being attributed by the physicians in charge of her case at the asylum to disease, and the characteristics of the malady in her sister and niece being in no respect similar to those claimed in her case.

7. A superintendent of an insane asylum, whose knowledge of a former inmate is derived solely from her record appearing

upon the books of the asylum from the time of her admission until her death, is not competent to give an opinion as to what must have been her condition during the period of her confinement, his proposed answer being based upon the absence from the record of those things which he says would undoubtedly have been noted if they had existed.

8. Instances of forgetfulness alone are no evidence of incompetency in a testator to make a will, nor are they a sufficient basis for expert testimony on the question of his sanity.

9. A hypothetical question which, while mentioning some things which would possibly be evidence of some mental derangement, refers to facts which, standing alone or in connection with other things, have no tendency to show insanity or incompetency in a testator at any time, is incompetent.

10. Contestants of a will will not be permitted to introduce contradictory evidence upon a given point, and then base hypothetical questions upon the theory that some of their witnesses are correct and others mistaken, or that some have testified truthfully and others falsely.

11. It is eminently unfair, in a case involving the contest of a will on the ground of the mental incompetency of the testator to make it, to select a few facts which tend naturally to show competency and sanity, and ask an expert witness, who has testified that in his opinion the testator was insane, whether such facts change his opinion.

12. It requires a less degree of capacity to make a will than a contract, and when a testatrix is able to recognize her friends, relatives, and acquaintances, to make contracts, to know her property and tell what it is, and to take care of and manage it, the law says she is capable of disposing of it by will; and medical experts cannot set aside the law by stating that those facts make no difference with their opinions.

13. The competency of expert testimony, where questions of insanity are involved, is recognized by this Court in many decisions; but it must not be forgotten that in all cases of importance it is the unfortunate fact that we find these experts arrayed against each other; citing *Beaubien v. Cicotte,* 12 Mich. 501.

14. The object of expert testimony is to enlighten the jury upon those facts which need interpretation, and all facts should be excluded from hypothetical questions which the jury can interpret as well as the expert.

15. No more important duty is devolved upon trial courts in cases involving expert testimony than to see that hypothetical ques-

tions are framed upon a proper basis, and to instruct the jury as to the consideration and weight they should give to them.

Error to Wayne. (Hosmer, J.) Argued October 7, 1891. Decided December 21, 1891.

Appeal from disallowance of probate of will. Reversed. The facts are stated in the opinion.

*George H. Prentis,* for proponents and appellants, contended:

1. Long hypothetical questions, reciting a great number of facts, are very objectionable; citing *People v. Brown,* 53 Mich. 531; *Higbie v. Insurance Co.,* 53 N. Y. 603; *State v. Hanley,* 34 Minn. 430.

2. An order should be entered reversing the judgment, without a new trial, and directing that the will be admitted to probate; citing *Millar v. Toulmin,* 17 Q. B. Div. 603. The circuit court may make such order or decree as the probate court should have made, or such order as law and justice shall require (How. Stat. § 6789), and cannot the Supreme Court do so?

*Alfred Russell,* of counsel, for proponents and appellants, contended:

1. This case is one of a class looked upon with disfavor by this Court, where persons of property were treated as sane in business before death, and afterwards are charged with insanity; citing *Pierce v. Pierce,* 38 Mich. 420; *Fraser v. Jennison,* 42 Id. 227.

2. When witnesses give their opinions as to the condition of the testator, they must give the *facts* on which their opinions are grounded, so that the court and jury may see whether the opinions have been formed by standards altogether incorrect and misleading, the opinions themselves being consequently worthless; citing *Spratt v. Spratt,* 76 Mich. 384; *Rice v. Rice,* 50 Id. 455; *Hoban v. Piquette,* 52 Id. 346; *Wurzell v. Beckman,* Id. 480.

3. The opening of counsel for contestants was such as to demand a reversal of the judgment; citing *Porter v. Throop,* 47 Mich. 313; *Maclean v. Scripps,* 52 Id. 236; *Scripps v. Reilly,* 35 Id. 371; *Rickabus v. Gott,* 51 Id. 227.

4. The statement by the counsel for contestants that the law pre-

sumed this will fraudulent for undue influence was not a correct statement of the law. *Schofield v. Walker*, 58 Mich. 96, decides no such thing. There a woman willed her property to her pastor to the exclusion of her niece, and the will was upheld.

5. The doctrine of undue influence adopted in courts of equity in regard to gifts *inter vivos* (*Norton v. Relly*, 2 Eden, 286; *Lyon v. Home*, L. R. 6 Eq. 655; *Thompson v. Hefferman*, 4 Dr. & War. 285; *Nottidge v. Prince*, 2 Giff. 246) does not apply to the making of wills; citing *Parfitt v. Lawless*, L. R. 2 P. & D. 462, 27 Law T. (N. S.) 215, 21 Wkly. Rep. 200.

6. It is settled that the question is as to actual capacity, not before or after, but at the actual time of the execution of the will; citing *Leech v. Leech*, 21 Penn. St. 69.

7. The security of private property has been so much shaken by contested will cases that our Legislature provided by Act No. 25, Laws of 1883, for the *ante mortem* probate of wills; and in passing upon said statute in *Lloyd v. Wayne Circuit Judge*, 56 Mich. 241, Mr. Justice CAMPBELL said that it "was probably designed to prevent the unseemly and disgraceful attempts, too often made, to defeat the enforcement of the last will of persons whose competency to deal with their own affairs was never doubted or interfered with;" and he afterwards suggested as a remedy the passage of a statute declaring that no will shall be held invalid for want of testamentary capacity in the testator, unless within one year prior to the date of the will the testator had been put under guardianship.

*Griffin & Warner,* for contestants.

*Otto Kirchner*, of counsel, for contestants, contended:

1. The first assignment of error considered in proponents' brief relates to the opening of counsel for contestants. We reply, in the first place, that the statements complained of were all substantially borne out by the testimony. But, even on proponents' theory, they have nothing to complain of in the opening, to no part of which was any objection taken. No ruling of the court was called for with respect to any part of the opening, and consequently no exception was taken to any ruling with respect to the opening. Attention is further called to the fact that the objection raised in this Court is only to the statements of counsel as to what he expected to prove. No case can be found where a judgment was reversed under circumstances such as are here presented; citing and commenting upon the following cases: *Scripps v. Reilly*, 35 Mich. 383; *Porter v. Throop*, 47 Id. 313; *Maclean v. Scripps*, 52 Id.

222, 223; *People v. Wilson*, 55 Id. 513; *People v. Welch*, 80 Id. 619; *Campbell v. City of Kalamazoo*, Id. 655; and the judgment in *Richabus v. Gott*, 51 Id. 227, was not reversed because of any statement of counsel; and, finally, the assignment of error is too general, covering 15 distinct portions of the opening; citing *Pratt v. Burhans*, 84 Mich. 487.

2. The objection that certain questions appearing in the depositions are leading is untenable. No objection was taken at the time to the form of any of these questions, and they cannot be made on the trial of the cause when the deposition is offered in evidence. But, aside from any such consideration, the questions in the main were not leading, within the decision in *McKeown v. Harvey*, 40 Mich. 226, where it was held that a leading question points out the desired answer, and does not merely call for an affirmative or negative answer.

3. A great number of the contestants' witnesses who had known and observed Mrs. King, some of them for a·period of 50 years prior to her death, ventured an opinion as to her mental capacity. These questions were put in various forms, such as whether, in the opinion of the witness, she had mental capacity to comprehend the paper offered as her will; whether she had sufficient mental capacity to bear the will in her mind, to remember its different parts, etc. These questions were objected to generally as leading and incompetent; but it is submitted that the form of the inquiries, as well as their subject-matter, was clearly competent, according to the ruling of this Court; citing *Porter v. Throop*, 47 Mich. 313; *Fraser v. Jennison*, 42 Id. 216; *Beaubien v. Cicotte*, 12 Id. 460.

4. It is also insisted that many of these non-expert witnesses had not stated sufficient facts upon which to base an opinion touching the mental competency of Mrs. King. A witness may express an opinion formed by personal observation of facts or *phenomena* so numerous and evanescent that they cannot be stated or described so as to enable persons not eye-witnesses to form an accurate judgment as to them, as to which, therefore, no better evidence than such an opinion can be obtained. This doctrine has received frequent recognition from this Court; citing *White v. Bailey*, 10 Mich. 155; *Beaubien v. Cicotte*, 12 Id. 501; *Kempsey v. McGinniss*, 21 Id. 138; *Rice v. Rice*, 50 Id. 454.

5. Objection is made to a question because it related to Mrs. King's mental condition three years prior to the time of making her will, but this Court held in *Hoban v. Piquette*, 52 Mich. 362, that an inquiry into the mental condition of the testator within 20 years of the making of his will was competent; citing, also, *Conely v. McDonald*, 40 Mich. 150.

6. The facts that a sister of Mrs. King was at one time confined in an insane asylum in Connecticut, and afterwards in one in Vermont, where she died, and that her niece was a patient at a Michigan asylum, were pertinent to the inquiry, as bearing upon the mental condition of Mrs. King, to whom both persons sustained close consanguinital relations; citing *People v. Garbutt,* 17 Mich. 9; Busw. Insan. § 235 *et seq.*, and authorities there collected.

7. The official records of the asylum were properly received in evidence. The person who made the entries was dead, and they were shown to have been made at the time and in the regular course of business: citing *Sisson v. Railroad Co,* 14 Mich. 489; *DeArmond v. Neasmith,* 32 Id. 231; *People v. Dow,* 64 Id. 717; *Thurstin v. Luce,* 61 Id. 298; *Inhabitants of Townsend v. Inhabitants of Pepperell,* 99 Mass. 40.

GRANT, J.   Mrs. Adaline King died in Detroit, November 9, 1886.   She left a will, dated July 31 of the same year, by which she devised to Rachel L. Doty, her husband's sister, her homestead in Detroit, her wearing apparel, jewelry, household furniture, pictures, and silverware; to John H. Prentis, a son of Browse T. Prentis, a gold watch and chain; to Mathew Huss, $500; and to Cora Doty, $50.   All the residue of her property she directed to be sold, and divided into seven parts, and devised two of said parts to George H. Prentis, and the other five to other legatees, five in number, who were relatives of her husband.   The will was admitted to probate by the probate court without contest, and on the last day provided by the statute contestants appealed to the circuit court, where a trial by jury resulted in a verdict against its validity.

Mrs. King was about 67 years old at the date of the will.   Her husband had died shortly before.   She had no children.   The contestants were her heirs at law, being her nephews and nieces.   An enmity of long standing existed between her and her brother and sisters and their families, the reason of which it is unnecessary to state. This fact is of importance in view of the opening

statement of counsel for contestants to the jury. Mrs. King was under no more obligation to these relatives than she was to the legatees named in her will.

The will was contested upon two grounds,—undue influence and incompetency to make it. The burden of proof in both of these particulars was upon the contestants, and it was incumbent upon them to produce positive proof in support of either one or both of these propositions to entitle them to a verdict. After permitting arguments to the jury for six days, the circuit court took away from the consideration of the jury the question of undue influence, holding that the contestants had made no case upon this point. Several errors are alleged, which will now be disposed of in their order.

1. In his opening statement to the jury counsel for contestants, after referring to the provisions of the will, said:

"Now, the law says, gentlemen of the jury, that when a will—an unnatural will, as this is—gives property away from kindred, the law draws an inference that that will was procured by fraud."

He further, in the same connection, argued to them that in this case the burden of proof was upon the proponents to show both lack of undue influence on the part of the legatees, and the competency of the testatrix. Counsel furthermore did not confine himself in his opening to a brief statement of the facts he proposed to prove, but argued questions of law and fact. He also stated facts which he proposed to prove, but which were not proven upon the trial. Counsel stated that Mrs. King was at one time taken to a sanitarium, and then used the following language:

"Dr. Gallagher, a physician there, wanted to give her some pills. He brought them to her, and she said they were flies. She says, 'They are not pills. I shan't take them.' 'Why not?' 'They are flies.' 'Why, Mrs. King, look at

them. Those are not flies. Examine them. Here they are; six pills; round and smooth and nice.' 'No, sir; you can't fool me; they are flies.' Now, the doctor wanted to know just how far this woman would carry this delusion,—whether it was put on or whether it was genuine,—and so he went out and got six flies, and killed them, and he put the pills on the table, and said, 'Mrs. King, there are the flies,' and he put on the table the six flies, and said, 'Mrs. King, there are the pills; now take your choice.' She says, 'I will take the pills,' and she gathered up the six dead flies, and ate them."

There was no foundation in the proofs adduced for this extravagant statement.

Counsel, in their opening to the jury, should be limited to a brief and concise statement of the facts which they propose to prove. It is likewise the duty of counsel to inform himself as to these facts, and to satisfy himself of his right to prove them. The opening is not the place for argument. The opening in this case was such as could scarcely fail to create a prejudice in the jury, and prevent a fair and impartial trial. As applicable to this branch of the case, I quote with approval the language in *Porter v. Throop*, 47 Mich. 320, Mr. Justice COOLEY speaking for the Court:

" We should impeach the judgment and legal knowledge of counsel if we were to assume that in making this opening he was putting before the jury those facts only which on reflection he had satisfied himself he had a right to prove."

Other language might be quoted from this opening statement fully as objectionable as that above given, but the latter is sufficient to illustrate its character, and to show the danger of permitting counsel to argue their cases to the jury upon a mistaken view of the law, and their own statement of the facts without proof. Especially is it the duty of courts to exclude from the jury the unjustifiable statements of counsel, as well as immaterial

and incompetent evidence, which might prejudice a jury,. in a case involving the validity of a will, when the soundness of the testatrix's mind was not questioned during her life-time by any of her relatives, and she was left in the entire control and management of her large property until her death. *Pierce v. Pierce*, 38 Mich. 420. For this error alone the verdict in this case should be set aside.

2. It is urged by the proponents that error was committed in permitting counsel for contestants to argue to the jury the question of undue influence. They urge that this ruling should have been made at the close of contestants' testimony, and that it is a fair presumption that the jury were prejudiced by the arguments of counsel. It is stated by proponents in their brief that no reply was permitted by them to the jury upon this branch of the case. If this is so, the record fails to show it. The record contains no indication that the circuit judge ruled upon this until after the arguments of counsel for both sides. It is, of course, important that such questions be eliminated from the consideration of the jury as soon as possible. It is the better practice to have such questions discussed in the absence of the jury, where it is claimed they are questions of law and not of fact. Then there exists no danger of prejudice. In the case of *Fraser v. Jennison*, 42 Mich. 214, the question of undue influence was eliminated from the case upon the opening statement of counsel for contestants. But it is quite possible, even where the question is first argued before the court alone, that the judge may not become convinced of his duty in the matter until after the arguments to the jury. In such case we cannot presume that the jury will not follow the instructions of the court, and leave the question out of their consideration. The result of this contention would be that a.

new trial must be ordered in every case where the court has taken from the consideration of the jury any question which has been argued before them. I find no authority for such a rule, nor do I think it founded in reason.

3. A large mass of immaterial and incompetent evidence was admitted. It would be a long and tedious task to select and point it out. It is unnecessary to do so, for a few instances will illustrate it all, and serve as a guide upon a second trial of the cause. A large amount of this testimony came from those who were employed in building a house for the testatrix in 1885. An instance of this is from one Edmund Austin, who testified as follows:

"I am a plasterer. I knew deceased in 1883. Did plastering on the job on Woodward-avenue house, under Stevens & Decker contract. Was there, off and on, for about a month. I have no doubt I saw Mrs. King five or six times. Talked with her mainly about the plastering. She seemed to take an interest in it, about as a wife would about her husband's interest. Also talked with her about plastering in old times. She was able to talk a long time without stopping. She had more to say than I did. Don't think I could remember definitely what she said. One thing I remember: I talked with Mr. and Mrs. King both about pay, and I remember she said she was gratified that Mr. King had paid me. If I remember Mrs. King did not dress up much. I did not know her prior to that time. * . * * I thought her conversation was quite erratic,—rather eccentric, curious,—that is the impression; mind you, I cannot remember distinctly any particular conversation, but that was the impression I gathered of her. Well, a curious, erratic sort of a woman."

Witness was then shown the will, and asked his opinion upon her mental capacity to make it; and he replied that he thought it "would be a very difficult matter for her mind to master it."

88 MICH.—37.

One George Hanley, a plasterer, did some work for her in her house in 1877 or 1878; again did like work for her in 1885.

"Saw a change between 1877 or 1878 and 1885. In 1885 she was fond of talking on different subjects,— rambling, disconnected conversations, different altogether from what she was when I first knew her.   *   *   * She was continually talking, and introducing various subjects, which had no distinct dependence on anything that was being done there by me. That was the principal thing that I saw in her. I did not test her memory. She said she would like to have some additional centers in the building beyond what the specifications called for, and that she was willing to pay for them, and I put them in. I have not received my pay yet. She said when they were settling up the whole business in connection with the building she would see to it. I saw her twelve or fifteen times, probably."

This witness then testified that he thought her mentally incapable of comprehending the will. John Scott testified:

"I first knew Mrs. King in the summer of 1885. Saw her at her house on Woodward avenue. She sent for us to get up plans for house on Hancock avenue,—wanted us to make a sketch of the house for her. Mr. King was present at first meeting. They both transacted the business. I was there half or three-quarters of an hour. She did most of the talking. I saw nothing unusual. Next interview she came to our office. She appeared to be unsettled as to what we were to do. Wanted it done different from what we were to do. I can't remember the conversation. I saw her in our office several times after this; once with Mr. King, and several times alone. I thought she was flighty in her notions. She changed her mind almost every time she came there. It was more particularly as to the cost of the house. She wanted a certain number of rooms for a certain price. She wanted to build a house worth $8,000 or $10,000 for about $3,500."

Witness then gave his opinion that Mrs. King did not possess sufficient mental capacity to understand the will,

and sufficient active memory to retain it in her mind without prompting.

Albert E. French drew the plans and specifications for an addition to Mrs. King's house in the summer of 1883. He never had any conversation with her except upon this building. He testified that she wanted certain arrangements made in the construction of the building, while her husband wanted it as the architect thought best. She wanted the stairs in a certain place, and different arrangements from what Mr. French thought was proper. He said her method was not consistent with good building or construction. When asked if he noticed any eccentricities about her he replied:

"Well, she would come out on the joists before the floor was laid in the addition,—the second floor joists, which were on a level with the floor where she was living,—and talk to the builders and to me, about the work, of course. * * * Her manner was excitable."

Witness further testified that he could not carry on a connected conversation with her. When asked why, he replied:

"Because she could not comprehend; that is, I considered that she could not comprehend it. I am speaking more particularly in connection with this work that I had in hand there."

Charles Weitz, a painter, worked upon the house in 1885 for Mrs. King. Saw her most every day for two weeks. Formed an opinion as to the state of her mind, his reasons for which were:

"Well, she used to talk too much; and one day I came there, and she was running around the house screaming, and had her dress open in front. She was in the kitchen. Mr. King was there. I don't know what it was that she was screaming. She talked and screamed both,—hollered. * * * She was scolding with the men. They did not do the work right; and she said she wanted it another way,—she wanted it done a different way, you know. She

did not want the work done that way; and she was fuss-
ing around with the men, and scolding. She changed
her mind as to colors. She did not like the carpenter's
work, and was kicking about it. She wanted more work
done than the specifications called for, and the carpenter
would not do it.    *    *    *    She said one day that
Mr. King's brother was not a very smart man; that her
husband was the smartest; and she was sorry that he was
not a lawyer,—something like that."

Witness was then asked his opinion of her mental
capacity to understand this will, to which he replied: "I
doubt it. I doubt whether she would understand the last
part of it."

Much other testimony of like character with the above
was introduced. Granting it all to be true, what tendency
has it to prove the testamentary incapacity of Mrs. King?
If Mrs. King's testamentary capacity is to be determined
by the fact that she talked more than some others, that
she seemed erratic, that she talked upon various subjects,
that she changed her mind as to the cost of her house,
or because she wanted different arrangements made from
what an architect thought proper or consistent with good
building, or because she once got angry and screamed, or
because she scolded the men who were doing the work,
or changed her mind about colors, or became enraged
and angry at those who were building her house, it is
quite apparent that not many wills could be sustained.
Such testimony does not, in my judgment, rise to the
dignity of evidence. As was said in *Fraser v. Jennison,*
42 Mich. 227:

"Any one of those circumstances may co-exist with a
perfectly sound mind, and any one of them may be looked
for as not an improbable misfortune or peculiarity in the
lot of a perfectly sane person."

All this testimony was incompetent, and should have
been excluded. It did not tend to show insanity or
testamentary incapacity. The witnesses had no such knowl-

edge, and testified to no facts, which rendered their opinions as to her competency admissible. If wills are to be set aside upon such opinions, the ability to make a valid one will be almost impossible, and the power to make them might as well be entirely taken away. The language of this Court in *Fraser v. Jennison,* at page 227 *et seq.,* will be found quite applicable to the present case.

4. Evidence was introduced by the contestants tending to show insanity in a sister of Mrs. King, who died in 1863, and in a niece, Miss Octavia Bates, one of the contestants, and a witness in this case. To show insanity in the sister, contestants introduced in evidence the record of the sister's confinement in a retreat for the insane at Hartford, Conn., and a like record of her confinement in the Vermont asylum for the insane. The superintendent of the retreat at Hartford testified that they generally record upon their books, kept in the retreat, the name, age, residence, place of birth, whether married or not, if married, the number of children, if any, occupation, condition of previous health, whether any other members of the family have been insane, whether the patient has been afflicted with certain diseases, etc.; also the history and symptoms of the disease in the patient. The record showed that this sister was first taken to the retreat in 1840; that she was discharged at the end of three months, and was received and discharged several times after that up to the year 1858, when she was transferred to the Vermont asylum. The following is taken from the record of the retreat:

"She is a native of Saybrook, Conn. Single. Age, said by her brother to be either 25 or 26 years. She had a paroxysm of insanity about eight years prior, which continued three or four weeks only. Since that time she had appeared to be perfectly sound in mind until some time during January last, when some aberration of mind

began to be noticed. Her friends are unable to assign a satisfactory cause for the present attack. By some it is attributed to scrofula. No member of her family or any of her relatives are known to have been insane. Her work has been very laborious (knitting seines), and in it she has appeared ambitious to excel others in the amount of labor she could perform. Since her insanity came on she has been very boisterous and talkative at times, and could illy bear any kind of restraint. She feels most hostility towards her family. Her appetite has been variable. Her natural disposition seems to be mild and amiable. Since the last attack she has received no regular attention from a physician, nor has she taken much medicine.

"Address, Charles Williams, Saybrook, Conn.

"Discharged June 9, 1844, cured."

Upon her fourth admission to the retreat the record states:

"She was, and we suppose she is now, troubled with scrofula complaint, and we believe that to be the cause."

All the record in the present case shows of the insanity of the niece is her own testimony, in which she states that she was taken ill in August, 1880; that she was told she was ill for 21 days; that when she awakened to consciousness she was in the woods at the Pontiac asylum, with a girl 20 years old, who told her that she had been very ill; that the last knowledge she had of Detroit was about the last week in August, when she fell asleep, and dreamed that the city was on fire; and that she at that time remained in the asylum about six months. Soon after Mrs. King's death this witness testified that she again went to the Pontiac asylum, at the suggestion of her physician, where she remained about four months. This testimony was objected to as immaterial. One of the counsel for contestants then stated to the court that it was competent, as bearing upon the physical condition of the witness. Upon the statement of the presiding judge that he thought he would exclude it, the other counsel stated:

"Then I will offer to prove, your honor, that the whole strain in connection with the matter made her sick,—so much so, she was obliged to return to Pontiac about November 20,—as bearing upon the question as to her being too ill to attend, and that illness was continuous, and existed both before and after."

The court then admitted the testimony for the purpose of showing insanity in the family. Is such testimony competent when the sole question is the testamentary capacity of the deceased? This question must be answered, so far as this case is concerned, in the light of the facts that no insanity has been shown in any ancestor of Mrs. King; that the insanity of Mrs. King's sister is attributed by the physicians who had charge of her case at the asylum to disease; that the characteristics of the malady in her sister and niece are in no respects similar to those claimed in the case of Mrs. King; and that, therefore, no case of hereditary insanity has been established by the proofs.

Counsel for contestants urge that such evidence is pertinent because of the close consanguinital relations of these persons to Mrs. King. The only authorities which they cite are *People v. Garbutt*, 17 Mich. 9, and Busw. Insan. § 235, and the authorities there collected. All the authorities cited, save one, are criminal cases, and in dealing with criminals the law in many respects recognizes a different rule from that in civil cases. It by no means follows that because such a rule prevails in the criminal law it must be adopted in the class of cases now under discussion. The exception above noted is *Snow v. Benton*, 28 Ill. 306. But it does not appear that the court there expressly passed upon the question.

Insanity arises from various causes. It may be produced by disease; by injury; by overwork, mental or physical; by grief; by sudden calamity, etc. Such insanity is not hereditary. Whether it may be hereditary in the direct.

lineal descendants of those so afflicted is immaterial here. Such is not this case. Upon what sound principle can Mrs. King's competency to make a will be doubted because her sister became insane from disease, and her niece, at the age of 34, was sent to an asylum for treatment? The circuit judge, in his charge to the jury, did instruct them that the voluntary retirement of Miss Bates to the asylum the second time, and her testimony in regard to it, were not sufficient to warrant any inference of insanity on the part of Mrs. King, and was incompetent for any purpose. Even in criminal cases it is laid down as the rule—

"When the existence of hereditary insanity is alleged as an excuse for crime, it must appear that the kind of insanity proposed to be proved as existing in the prisoner is no temporary malady, but that it is notorious, and of the same species with which other members of the family have been afflicted." Busw. Insan. § 236; *State v. Christmas*, 6 Jones (N. C.), 471.

To my mind, this rule, as applied to criminal cases, has much good sense to commend it; but, in my judgment, reason and common sense approve it as the proper rule to be adopted in the present case. Tested by this rule, all the evidence of the insanity of Mrs. King's sister and niece should have been excluded.

5. The present superintendent of the Vermont asylum was shown the record of this sister, appearing upon the books in that institution. So far as applicable to the question now presented, these entries, 11 in number, extended from November 2, 1858, to April 19, 1863, when she died. In their order they are as follows:

"No change since admission.

"Enjoys very good physical health.

"There is no change in the state of her mind; physically she is feeble.

"Physical health better; no change in state of her mind.

"No important change.

"Enjoys very·good physical health; no improvement in her mind.

"No change.

"Enjoys very good physical health; no change in the state of her mind.

"No material change since the above date.

"There has been no change in the case of Miss Williams, since she has been in this asylum, in the type of her malady.

"Died of exhaustion."

The superintendent was then asked to state his opinion as to what must have been the condition of Miss Williams from the time of her admission to her death. This question was incompetent. The witness had never seen Miss Williams, knew nothing except what this record showed, and bases his answer upon the absence from the record of those things which he says would undoubtedly have been noted if they had existed. Objections were raised to the admission of these records, but the above rulings make it unnecessary to refer to them.

6. A medical expert was placed upon the stand, and asked the following question:

"Now, doctor, I will ask your opinion as to the mental condition of Mrs. Adaline King on the 31st day of July, upon this state of facts: She died at Detroit on the 9th of November, 1886. She was then 67 years old. The immediate cause of her death was dysentery. It began about November 3 of the same year, soon after having eaten some chicken-broth that had been kept in the room for three days. She had at that time an old pasteboard box, in which she put crackers and cakes and meat in order to keep them from others, who she feared might eat them. She took the chicken-broth to her room to make sure no one else in the house should eat it. She was told that the chicken-broth was not fit to eat, but she insisted upon eating it. Her husband, to whom she was married in 1850, died in the month of June prior to her death. She had no children. In the month of December following her marriage she purchased

two lots on Woodward avenue for $1,100. They are now worth not less than $75,000, and probably more. She also owned a house and lot on Hancock avenue, which she built in 1885, and completed in 1886. This, with the Woodward-avenue lots, constituted substantially all of the estate of which she died seised. In her early life she was tidy in her person, tasteful in her dress, and refined and gentle in her manner. In 1872 she had prolapsus of the womb, from which she suffered more or less, with varying intensity, until she died. At the same time she complained of distress in her stomach, and was subject to paroxysms, which increased in intensity and frequency of duration on the 22d of July, 1886, and until the day of her death. Her attendant physician found her complaining with distress of the stomach, of inability to digest her food. He found her nervous system much debilitated, and suffering from paroxysms, during which time she was very weary, and would not remain quiet for sufficient time to enable the physicians to take her temperature. Her pulse was about 80 beats to the minute. It was discovered that the distress of which she complained was greatly exaggerated, and that she was possessed with a desire to impress those about her with an exaggerated idea of her sufferings. When her mind could be diverted she would forget all her ailings. A *post mortem* examination showed she was not suffering from any chronic disease of the stomach. The intestines showed signs of acute inflammation. In the month of September or October, before she died, she came down-stairs one morning between six and seven o'clock, and said to her late husband's nephew in reference to an $18 grocery bill that had been contracted: 'What do you mean by running up such an enormous bill? When you run up such a bill as that I feel as if I could take this knife and kill you;' thereupon taking a large knife in her hand. Mr. Doty thereupon told her, 'You had better lay that knife down,' and then took hold of her arm, and led her up-stairs. Another occasion,—about five or six years ago,—she came down in Mr. Doty's room, and asked him if she could not lay down on his bed, it looked so nice; and Mr. Doty told her that she might, and she thereupon did so. Upon the subject of the incident with Mr. Doty she told her nurse, Mrs. Narr, that she had picked up a knife, and that Mr. Doty put her out of the room, and that the $18 grocery bill was exorbitant. What, in

your opinion, was her mental condition on the 31st day of July, 1886, upon the facts that I have recited?"

The question was admitted under objection, and the witness replied:

"I am unable to form upon that hypothetical question an opinion. I want to hear a little more."

The witness was further questioned upon this hypothetical question, but again said he did not think it contained sufficient *data* to form an opinion from; and the court thereupon excluded the question. Counsel then submitted the following question, under objection of proponents' counsel:

"Now, doctor, if you pay attention, in 1885 she was engaged in building the Hancock-avenue house. She visited it frequently, and gave directions to the workmen. When they complied with her directions she would within a day, and sometimes within two hours, deny having given such directions, and find fault with the men. As far back as 1878 she took baths at a public bathing establishment, and did not have sufficient memory to remember having taken her bath from one day to the other. At times she expressed a desire to come out of her bath, and, when preparations were made to that end, she would deny that she had expressed a desire to come out. In the fall of 1884, while taking her meals at a restaurant, she would forget what she ordered, and deny that she had ordered the things that were brought to her, and insist that she had ordered something else. She would ask Mr. Mix, at whose house she was staying, to take her for a walk,. and, when he did so, inquire of him the reason for so doing, and insist that she had not so requested him. Upon these facts, can you state what was her mental condition on the 31st day of July, 1886, independently of the facts embraced in the first question?"

After asking counsel whether he should consider this question in connection with the last one, and after being told, "No, independent of it," witness replied: "I should say she was demented. She was insane." He was then asked what his opinion was, taken in connection with

the facts stated in the first question, and his reply was .again that she was insane, and that, in his opinion, she ·did not possess mental capacity to understand or make ·the will.

There are some things mentioned in the first question which would possibly be evidence of some derangement ·of mind. The second question involved simply instances ·of forgetfulness, all of which happened more than a year previous to the execution of the will. Instances of for- .getfulness alone are no evidence of incompetency in a testator to make a will, nor are they sufficient basis for ·expert testimony as to sanity. I am unable to conceive how the learned physician could have answered this .second question in the manner he did. · It can only be .accounted for upon the theory that he had in his mind ·other supposed facts in regard to the condition of Mrs. .King. This question was incompetent. The first ques- tion was also objectionable, in that it referred to facts which, standing alone or in connection with other things, .had no tendency to show insanity or incompetency at any time. The facts that she died of dysentery; that she was married; that her husband had died in June previous; :that she had no children; that she early purchased property, which had greatly increased in value; that she ·complained of distress in her stomach; that it was dis- ·covered that her distress was greatly exaggerated; that she ·desired to impress those about her with an exaggerated .idea of her sufferings; that she forgot her ailings when her mind was diverted; that a *post mortem* examination .showed that she had no chronic disease of the stomach; :that her intestines showed signs of acute inflammation,— had no tendency whatever to show insanity, much less testamentary incompetency.

The only other circumstance worthy of mention stated in :the first question as a basis for the opinion of the physician

is that in regard to the grocery bill. The statement in, the question is not in accordance with the evidence,. which shows Mrs. King's statement to have been, "When you run up such bills I feel like killing myself." The difference between the two statements is apparent. We are not informed what this grocery bill was, nor the circumstances under which it was contracted. But, be the circumstances what they may, is it anything more than an ebullition of temper, prompted possibly by a. somewhat miserly disposition? If her language had been much stronger and her anger greater, it would still fall far short of evidence of insanity, or incapacity to execute the will. There was nothing in either or both of these questions to justify either the question or the answer.

Several other hypothetical questions were asked this. expert, and in one of them it was stated, among other things, that Mrs. King had once stated in the spring of 1886 that she had no stomach, and to another that her stomach was bad; that she complained of pain in her stomach, of dyspepsia, and of inability to eat, yet she ate her regular meals, had a good appetite most of the time, and sometimes ate to repletion. I am not versed. in the various forms of dyspepsia, nor of the symptoms thereof, nor am I aware that eating to repletion will not, sometimes cause distress in the stomach and dyspepsia. If a declaration by a dyspeptic that he has no stomach,. or that his stomach is bad, is evidence of his mental. incapacity, dyspeptics may as well refrain from making wills. But both the witness and the jury were by this question given to understand that Mrs. King was not. affected with dyspepsia, and that in this respect she was under a delusion. Two physicians, witnesses for contestants, one of whom treated her in 1884, 1885, and 1886, and the other, an old and distinguished physician, who had known Mrs. King for 36 years before her death, and

had treated her, both testified that she was afflicted with dyspepsia. Contestants must be consistent in the presentation of their case. They will not be permitted to introduce contradictory evidence upon a given point, and then base hypothetical questions upon the theory that some of their witnesses are correct and some of them mistaken, or that some have testified truthfully and others falsely. This witness further testified as follows:

"*Q.* Suppose, while she was building her house in 1885, she went up there, and recognized the carpenter, and recognized the painter, and recognized the mason, and never made any mistake as to who was which, never would call the painter the carpenter or the carpenter the painter, and was able to recognize her friends, and was able to recognize what property she possessed, and to tell others what property she had, and to bargain with the nurse as to the amount she was to receive per week for attending her; supposing all those things were so, would they modify the opinion that you have expressed concerning her?

"*A.* They would not.

"*Q.* Will you state why?

"*A.* From the fact that insane persons are often able to do that, and at the same time not be able to transact other business. The faculty is seldom lost to recognize friends or individuals, but the ability to reflect, to consider the relations of things one to another, is lost at the same time."

This question was incompetent for two reasons:

1. Because it did not contain a full statement of all the facts which tended to show competency. It is eminently unfair in such cases to select a few facts which tend naturally to show competency and sanity, and ask the expert whether that changes his opinion. All the facts tending to show sanity should be included, were the question competent.

2. Every person is entitled to the natural inference to be drawn from his acts and conduct. It was the province of the jury to determine these facts, give them their

natural interpretation, and consider the opinions of the expert witnesses in connection therewith. It requires a less degree of capacity to make a will than it does to make contracts, and when one is able to recognize her friends, relatives, and acquaintances, to make contracts, to know her property and tell what it is, and to take care of and manage it, the law says she is capable of disposing of it by will; and medical experts cannot set aside the law by stating that these facts make no difference with their opinions.

This witness further testified that the insanity of Mrs. King's sister would have an important bearing in determining the question of her own sanity. The unfairness and evasiveness of this witness appear upon his cross-examination. Upon being asked whether the fact that her sister's insanity, if produced by physical injury to the brain, would have any tendency to prove that Mrs. King inherited insanity, he replied:

"I have already said that traumatic injuries sometimes produce insanity."

Upon being asked what there was in the question submitted to him on direct examination to indicate that the sister inherited insanity, he replied:

"I have already stated that Mrs. King was insane, and the fact that she was insane and her sister insane; there are two persons in the family insane; therefore there must be a predisposition."

The sanity of Mrs. King was the issue upon which he was testifying. The contestants were endeavoring to draw the inference of predisposition, because of the insanity of her sister; but the witness draws his inference of predisposition from the fact that in his opinion the two were insane. Such testimony is utterly worthless, and cannot assist the jury in reaching correct results.

He further testified on cross-examination that *prolapsus· uteri* may be consistent with sanity, and it may not be. He is questioned as follows upon this point:

"*Q*. What are the great majority of those cases, insane· persons or sane?

"*A*. A good number of them have become insane.

"*Q*. A great majority of the persons are sane, are· they not?

"*A*. Yes, sir; and a good many insane.        *        *        *

"*Q*. In 1885 she was engaged in building the Hancock-avenue house. She visited it frequently, and gave directions·to the workmen. Those facts are consistent with sanity are they not?

"*A*. I think, taken separately, I could not decide the· question.

"*Q*. When they complied with her directions?

"*A*. I don't think it would be inconsistent, taken separately, in her case.

"*Q*. Is the fact that in 1885 she was engaged in building the Hancock-avenue house, and visiting it and giving directions to the workmen, any evidence to your mind of her insanity?

"*A*. I am not able to form an opinion on that question.

"*Q*. Separately, are not those facts consistent with sanity?

"*A*. Not necessarily; no, sir."

Every one·must know that the facts above mentioned are consistent with sanity, and are inconsistent with insanity.

The competency of expert testimony, where questions; of insanity are involved, is recognized by this Court in many decisions. But it must not be forgotten that in all cases of importance it is the unfortunate fact that we find these experts arrayed against each other. *Beaubien v. Cicotte,* 12 Mich. 501. This case forms no exception. The object of such testimony is to enlighten the jury upon those facts which need interpretation. In these hypothetical questions all facts should be excluded which the jury can interpret as well as the expert. The·

courts do not agree as to the value to be placed upon such testimony. No more important duty is devolved upon trial courts in these cases than to see that these questions are framed upon a proper basis, and to instruct the jury as to the consideration and weight they should give them. Enough has been said to point out the defects and errors in the expert testimony introduced by the contestants, and further discussion on that point is unnecessary.

7. Mrs. King visited some friends in New Haven, Conn., in October, 1884. The depositions of these parties were taken, showing the conduct and actions of Mrs. King during that visit, which the record shows were the most damaging of any. On cross-examination proponents offered in evidence certain letters written by Mr. Mix, at whose house she visited, and they were excluded by the court. These letters were written to the husband of Mrs. King, and contained no reference to the disgusting details testified to by them. These letters should have been admitted. They had a direct bearing upon the credib·lity of the witnesses.

8. On the cross-examination of Mrs. Mix, a witness for contestants, she was asked if Mrs. King, while visiting her, did not attend a banquet; to which she replied: "Not to my knowledge. I don't remember." Counsel then sought to call her attention to certain facts in connection with this banquet, evidently for the purpose of refreshing her recollection. This the court excluded. This was error. In view of the extraordinary testimony of this witness and her husband, a very broad latitude should be allowed in the cross-examination.

The record in this case contains 1,029 pages, and 278 errors are assigned. I deem it unnecessary to notice them

88 MICH.—38.

in detail. I think they are already sufficiently covered by the above opinion.

Judgment is set aside, with the costs of both courts, and a new trial ordered.

The other Justices concurred.